## Will of James Dietz.

On appeal from a decree of the ordinary, whose opinion is reported in *Dietz's Case, 14 Stew. Eq. 284.*

Paterson, J. (*dissenting*).

This case presents an issue between two instruments purporting to be wills executed by James Dietz, of the county of Essex, offered for probate before the surrogate of that county, in April, 1884.   The orphans court admitted the one dated January 6th, 1870, and, on appeal therefrom, the ordinary reversed such decree, and sustained the validity of the will made on the 18th of June, 1880.   This tribunal now is to determine which of these differing opinions shall stand.

Upon a careful consideration of the proceedings and testimony on which the courts reached a conclusion adverse to each other, I have formed a judgment, the reasons for which I propose to submit.

An observation occurring naturally just here, and first in order, is that while the orphans court rejects the validity of the will of the latest date, neither the proponents of that will, nor the decision of the ordinary, giving legal efficacy to that instrument,

44

attacks, or endeavors to invalidate, even by innuendo, the earlier document. In other words, while the one will is assailed in a style so vigorous and effective that the orphans court, before which the testimony was taken orally, and therefore the only tribunal capable of observing the manner in which such testimony was given in by the witnesses, declared the weight of evidence demonstrated very clearly that James M. Dietz never made or executed the later will, the earlier will was admitted directly by the proponents of the later one to be unimpeachable in form and substance, and in and of the capacity of the testator to execute the same. This fact strikes me, under the surroundings of the case, as significant. True, the proponents of the will of June 18th, 1880, were not compelled, in order to establish their case, to contest the regularity or soundness of the one of January 6th, 1870, nor, obviously, would it have been good policy, or very consistent with their own interest, to take that course. But still, the result is that one of the two instruments produced as the wills of said testator stands out clear of any objection or criticism, while the other comes up under a cloud, and darkened by suspicious circumstances, shrouded in mystery, the testator silent as to its execution and giving no hint, since its date, of the existence of any such instrument. One is free from doubt and acknowledged throughout to have been the act of James M. Dietz, to have been made by him when he was the same man he had been in life to that date; the other, if authentic, was prepared by a person of a very different character—a man diseased in body and impaired in mind, superinduced by changed habits, a mere wreck, physically and mentally, of what he had been once.

If the evidence discloses any one fact in the case conspicuously, it is that the testator, in all the relations of life—in religious faith, in moral character, in sobriety of conduct as the head of a family, and in general standing, had deteriorated in his latter years. A person enfeebled in mind naturally would become liable to the controlling influence of a superior intellect; and such a result often happens under circumstances similar to those developed here. Now, it is not only a doctrine of law, but a *dictum* of

common sense and justice and equity as well, that, where a posterior will is sought to be established over one prior in date and execution, all other things apparently being even, a court of probate would be careful to see that the execution of the posterior will was proved regularly and fully with particular formality, just because the instrument revoked one made previously. Much stronger proof should be required to establish the validity of a later will, where the circumstances attending its execution are mysterious and obscure, veiled in secrecy, enveloped in a cloud of suspicion, and assailed by direct contradiction. That is the case now. One will, that of the 6th of January, 1870, is not controverted at all ; the other, that of the 18th of June, 1880, is disputed very energetically. This fact alone is very significant. It is equally clear that if a doubt exists upon examination and consideration of the facts disclosed by the testimony, that doubt should prevail in favor of sustaining the will which is free from suspicion. It is apparent, then, that the decision in this case must depend upon the issue whether the proponents of the posterior will have succeeded in convincing the judicial conscience of this tribunal, as they have the prerogative court, that such instrument, beyond all manner of doubt, is the true and only *bona fide* last will and testament of James M. Dietz, established as such by preponderance of evidence.

It is to be noticed, also, that the later will contains no clause of revocation. This omission, of course, is no defect in the instrument of a serious character, for that, of itself, is sufficient for such purpose. Still, where a person desires to change the nature of his testamentary bequest, prudence would require something in that nature, either general or special, the last being the wisest, because the most precautionary. If the testator, for any reason, proposed to modify, and especially if he intended to make radical or essential alterations in the disposition of his property, to take effect after death, he would be particular, it might be supposed, in revoking the devises in an existing will, the more so when that was in the keeping of one whose interest was to be affected materially by the change. It would be but natural, too, for him to obtain possession of the document he

designed to destroy or alter so thoroughly. Nothing appears in the evidence to show that Mr. Dietz ever made any effort in that direction or so much as hinted either that he designed to execute or that he had executed a will other than the one he had put in the keeping of his wife, and about which, even after he became worse for the habits of his later years, he continued to speak to her. Certainly he was not reticent or reserved as to that instrument. This omission to revoke the prior will, if such was his intention, is singular, to say the least. Annulling the latter, by special declaration would have emphasized his wishes, if it did no more.

The first will, then, being undisputed, admittedly correct in form and execution, and the testator's capacity being unchallenged and undoubted, while the later one is in a position just the reverse, and hatcheled vigorously on all sides and on every point, clouded in suspicion, and kept in the dark for nearly four years, a "document" of unknown existence, not talked of by him, secreted in his safe, while the other had been given, and properly, into the custody of the main beneficiary, of whom the testator had said, to a professional adviser, he was proud, and had left all he had to her, it must follow that the testimony required to sustain the will of the 18th June, 1880, should be strong in character and conclusion beyond question. One fact appears throughout the case, and it is that no opposition has been or would have been offered to the probate of the anterior will. It is evident all round that no one has proposed to contest it. There is nothing in the record to warrant such an idea. That stands upon its merits, namely, having been executed by a testator of sound and disposing mind and memory, and signed, sealed, published and declared by him in legal form and solemnity. Now when a testamentary instrument of that character, which of itself and in itself, would meet with no opposition, and encounter no contest before the tribunal of probate, is sought to be set aside for no defect of its own by another of later date that is subjected at once to impeachment of no formal or trifling character, and gives back no return in kind, it is evident that the advantage must lie with the one of a clean and clear record.

Dietz's Case.

The two are not and cannot be on the same footing before the lower jurisdictions or here. One starts forth free and light in the race, the other hampered and weighted down.

The preponderance of testimony must be decisive in favor of the later will. Mere equality will not answer, for the two instruments, of themselves, cannot be considered as being on a par. Algebraically, the case before us, or the prominent question for determination, may be stated in this form: The posterior will must equal the anterior one, plus the strength of the latter from being unopposed, and also the fact that in the absence of any other instrument of a testamentary nature that would be admitted to probate without hesitation. Does it do this? The pith of the controversy lies here. A brief review of the salient parts of the testimony will be sufficient for the purpose.

Remembering that the contest is confined to the will of June, 1880, the validity of that instrument is to be determined, if at all, by the deposition of the subscribing witnesses. These swear that the testator was in the city of New York on the 18th day of that month, and wrote and executed the will at his desk in their office in Fulton street. No other persons, so far as is shown by the record, saw the testator in the city at that date. There is no direct testimony as to that fact to sustain this statement of these persons. Ordinarily, such evidence would be amply sufficient to admit a will to probate. If any person, disinterested and reliable in character, had been produced who also had seen Mr. Dietz there at the time, the preponderance of evidence in favor of this will might have been sufficient to overcome the disadvantage under which it started forth probate-ward. But no one was found to corroborate the subscribing witnesses in a direct manner, and they are sustained only by whatever weight can be derived from inference or circumstance. This is the strength of the case of the respondents, when tested by the direct proof of James M. Dietz having been seen in New York on the 18th day of June, 1880. It is of a character, confessedly, that must be met by positive testimony of a countervailing, if not paramount, nature. A simple negative affirmation, if that be a correct form of expression, by any number of persons, who did not see him

there on that day, sustained by circumstances tending to show the improbability of his having been in the city as detailed by the subscribing witnesses, will not answer. He must have been seen elsewhere, and in such a situation and condition, physically, that it would have been impossible for him to have been in New York also on the same day. Manifestly, a person in impaired health may be in several places in business hours (and all know that invalids are very apt to be imprudent, if for no other reason than contrariness, or to show what they can do despite medical injunction). Mr. Dietz, judging from the testimony as to his habits and deterioration in manly and moral attributes in the later years of his life, was something of that kind, at the time of the transactions developed on the record. He appears to have been in the habit of leaving home against the advice of his physician, and without the knowledge of his family, when prudence should have forbidden him to do so. All this but demands more emphatically that the positive testimony of Smith and Hortz be met and counterbalanced by evidence equally positive at least, or the will of 1880 must stand. What is the nature and substance of that evidence which one tribunal declares to be sufficient to overcome the proof of the respondents in this respect, and another has pronounced incompetent?

It is clear that, at the time in which this will of 1880 was alleged to have been executed and published by the testator, and both before and afterwards, he had been kept home, to a great extent, by periods or attacks of illness. The record demonstrates this, and from the evidence, unchallenged as to the amount, it is manifest that from January 1st to July 1st, 1880, his physician had been paid over $300 for services rendered to him, besides a deduction of $46 for attendance on his wife, made because Mr. Dietz regarded the visits to his wife as unnecessary. Mr. Dietz himself, by payment for services to him, admits that he was sick much of the six months included in the bills, for as the charge never was less than $2 a visit, one professional call a day would account for nearly the whole period covered by the bills so paid. Visits, however, were made sometimes more than daily, and also during the night, when the fee

for attendance was increased.   Naturally, under such circumstances, the testimony of the medical attendant of Mr. Dietz would be of the first importance to rebut the strength of the evidence produced by the respondents to maintain their case.   This physician swears, from memoranda and a book she kept, that on the 18th day of June, 1880, she made a professional visit to Mr. Dietz, at his house, and saw him there then.   It was not later than ten o'clock in the morning, for all the visits were made to him at an early hour, on account of his condition and state of health.   This gave Mr. Dietz ample time to arrive at his office, in New York, in the forenoon, when Smith says he was there, writing or transcribing the will, and is not sufficient to overcome the statement of the witness and his associate.   But the doctor, who was a feminine practitioner, goes further, and declares that Mr. Dietz was in bed, and could not stir from the depletion caused by the effects of cystic hemorrhage and an attack of muscular rheumatism.   He was confined to the room, and helpless, and assisted from the bed to the lounge.   Remember that this is said by the witness in response to questions about this particular 18th day of June, and not generally of the time during which she was attending him.   So her testimony as to seeing Mr. Dietz in Orange on that day, and, moreover, in a condition which rendered it impossible, physically, for him to go to or be in New York, is as decided and positive as that of Smith and Hortz to the contrary.   It is affirmative in character, not negative simply ; she saw him in Orange in such a state as would forbid him getting to New York, or anywhere else, on that day. Then Joseph A. Marsh, who was employed by Mr. Dietz from July 20th, 1879, to June 24th, 1880, testifies that the testator was confined to his bed a week, at least, if not more, before he, the witness, left his service.   So Marsh saw Mr. Dietz in Orange on that day, and says, in addition, that the latter was in his house at the time, and not able to get to New York.   This witness drove Mr. Dietz to and from the railroad station, and says that the latter went to New York usually by the eight-twenty train. His testimony confirms that of the physician, and is in direct contradiction of Smith and Hortz.

Another witness is Elizabeth Somerville, the substance of whose testimony is that she saw Mr. Dietz at his home on the 18th day of June, 1880, and that he was not able to leave his bed. She gives reasons of weight for her statement, which, if true, would render it impossible for Mr. Dietz to leave home then. Ada Long saw Mr. Dietz at home in the month of June, 1880, and as being in his room. She left on the 29th. These persons who have sworn to the fact of Mr. Dietz being in Orange on the 18th day of June, 1880, and unable to leave home, are disinterested. Besides these, Mrs. James Dietz testifies to the same facts, but her testimony may be subject to criticism as to credibility because a person interested in the event of the suit. Be that as it may, it is entitled to full consideration when in harmony with that of others; and as it is a repetition, substantially, of the fact that her husband was in the house in Orange on the 18th day of June, 1880, sick in bed, and not able to leave, it is not necessary to repeat the details.

This, then, is the substance of the testimony spread on the record, by which it must be determined in which place the testator was on the 18th day of June, 1880, New York or Orange. No person has been produced who saw him in each of those cities on that day, nor, so far as my examination has extended, does it appear that he was seen on his way to or from the railroad station or ferry-boat. The man in his service who took him to or brought him from the train, says he did not do so on that day, for he was confined to his bed. The character of the evidence of these witnesses for both appellants and respondents, is positive all round, and their stories cannot be made to harmonize. One or the other of the set of witnesses must have committed a mistake or an error more serious in character, but to incline to the charitable view, I ask only, Which of the two are most likely to be mistaken, and which story is the most probable? There are five on one side and two on the other. They do not disagree as to the fact that the testator was in Orange on the 18th day of June, 1880. But the two swear they saw him in New York at that time, while the five depose just as strongly that he could not leave Orange by reason of physical inability, being confined

Dietz's Case.

to the house and sick in bed. These witnesses stand alike on the record for credibility, no impeachment of the character of any of them being attempted. There is nothing whatever in any of the circumstances brought to corroborate the appellants or the respondents calculated to give the latter that preponderance of testimony which is necessary to establish the will they represent. In a case like this, where the matters in controversy are not of a legal nature, and in all its long and protracted history an authority in law hardly has been cited on argument and in opinion, inconsistencies and contradictions will occur, and such are visible here. The orphans court was impressed strongly, and it seems to me with good reason, by the improbability of the story of these two attesting witnesses. That story is one and must be taken as a whole. They say that Mr. Dietz sat down, without book, form or manuscript, and wrote the will they witnessed, taking some two hours in the operation. The paper is without erasure or alteration. It is drawn in legal language. It has several nice legal provisions. It is improbable that James M. Dietz could have done this, and equally so that he could have run off the draft he is alleged to have prepared, from a memorized form. Taking all things into consideration, after a careful and close examination of the record, it is clear to me that the respondents have failed to establish their case. Their evidence is impeached by their own story, and in my judgment balanced with something to spare, by testimony fully as positive and strong. If Mr. Dietz was in New York on 18th June, 1880, or even on other days in that month, it is singular that no one of his family or domestics, or any person accustomed to see him in Orange, has been found to say he was noticed on his way to the railway station. The cherry incident is peculiar. In this latitude, the 30th or 31st day of May is an early season for the ripening of that fruit, while the middle of June, ordinarily, is high carnival. The lad was in Orange on one of the days named by the parties. Each of those days was a holiday at the college he was attending, and he was free on either. The statements of the witnesses cannot be reconciled, and all sustain their assertions by particular reasons which strengthen their memories.

Dietz's Case.

Evidently there is an error here too, and, without imputing sinister motives on the part of any, my conclusion is that the probabilities favor a mistake by those who testified on behalf of the respondents. Some effort has been made to show that Mr. Dietz was the "sick man" of the medical bills, but the record bristles with proof that Mr. Dietz was under the care of a physician the greater part of the first six months of 1880, and paying for the services rendered to him. So far as disclosed in the case, he must have been paying very roundly, if those services were on account of another, mentioned only casually as requiring medical treatment.

Besides, it seems to me, that the orphans court had the best opportunities of determining the matter on its merits. That tribunal could give proper effect to the action as well as the words of the witnesses. Demeanor very often is a significant factor for the consideration of both court and jury. If unable to reach a satisfactory conclusion from the record, the opinion of those before whom the proceedings were taken originally, would be apt to control my judgment.

It may be added, that a probate court is ecclesiastical in nature, and governed by canon rather than by common law. Where an anterior will is sought to be annulled by a subsequent testament, devoid of a special clause of revocation, especially where the existence of the first is known and that of the other concealed, the conscience of that tribunal would not be bound by strict legal rules. There should be no reasonable doubt of the intention of the testator to change the disposition of his property. Here no proof whatever, beyond the mere execution of another will, has been offered, and direct testimony and suspicious circumstances concur to negative any such purpose. The questions involved are of facts simply, and require no precedents or authorities. Those are out of place. There is no law applicable to the facts but equity and good conscience, and these require, very clearly, that the decree of the prerogative court should be reversed.

For affirmance—THE CHIEF-JUSTICE, DEPUE, DIXON,

MAGIE, PARKER, REED, SCUDDER, VAN SYCKEL, CLEMENT, McGREGOR—10.

For reversal—KNAPP, BROWN, COLE, PATERSON, WHITAKER—5.